UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DIRK EDMOND,                          )          NO. CV 07-2240 AGR
                                      )
            Plaintiff,                )
                                      )
      v.                              )
                                      )          MEMORANDUM OPINION AND
MICHAEL J. ASTRUE,                    )          ORDER
Commissioner of Social Security,      )
                                      )
            Defendant.                )
                                      )

      Dirk Edmond filed this action on April 10, 2007.  Pursuant to 28 U.S.C. §

636(c), the parties consented to proceed before Magistrate Judge Rosenberg on

May 21 and 22, 2007.  On January 8, 2008, the parties filed a Joint Stipulation

("JS") that addressed the disputed issues.  The Court has taken the matter under

submission without oral argument.

      Having reviewed the entire file, the Court remands for further proceedings

consistent with this Opinion.

///

///

///

///

**I.**

## PROCEDURAL BACKGROUND

On June 28, 2002, Edmond filed applications for disability insurance and supplemental security income benefits.  A.R. 15.  The applications were denied initially and upon reconsideration.  A.R. 33-34.  Edmond requested a hearing.  A.R. 45.  The Administrative Law Judge ("ALJ") conducted a hearing on November 24, 2003, at which Edmond and a vocational expert ("VE") testified.  A.R. 323-355.  On June 24, 2004, the ALJ issued a decision denying benefits.  A.R. 12-19.  On July 27, 2004, Edmond filed a request for review of the ALJ's decision.  A.R. 11.  On May 24, 2005, the Appeals Council denied Edmond's request for review.  A.R. 5-8.

This lawsuit followed.

**II.**

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to deny benefits.  The decision will be disturbed only if it is not supported by substantial evidence, or if it is based upon the application of improper legal standards.  *Moncada v. Chater*, 60 F.3d 521, 523 (9th Cir. 1995); *Drouin v. Sullivan*, 966 F.2d 1255, 1257 (9th Cir. 1992).

"Substantial evidence" means "more than a mere scintilla but less than a preponderance – it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion."  *Moncada*, 60 F.3d at 523.  In determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence.  *Drouin*, 966 F.2d at 1257.  When the evidence is susceptible to more than one rational interpretation, the Court must defer to the Commissioner's decision.  *Moncada*, 60 F.3d at 523.

///

2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**III.**

**DISCUSSION**

### A.    Definition of Disability

"A person qualifies as disabled, and thereby eligible for such benefits, only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Barnhart v. Thomas*, 540 U.S. 20, 21-22, 124 S. Ct. 376, 157 L. Ed. 2d 333 (2003) (citation and internal quotation marks omitted).

### B.    The ALJ's Findings

The ALJ found that Edmond had the following severe impairment: depression.  A.R. 19.  Edmond had the residual functional capacity to "sit, stand, and walk for up to six hours each day, with appropriate breaks.  He has no lifting limitations.  He is capable of performing simple, repetitive tasks." *Id.*  Based on his residual functional capacity, the ALJ found that Edmond could perform his past relevant work as a bagger, delivery driver, ramp agent (baggage handler) and stock clerk.  *Id.*

### C.    Mental Residual Functional Capacity

#### 1.    Dr. Maloff

Edmond completed high school and one year of college.[1]  A.R. 16.  His past work included experience as a bagger, delivery driver, baggage handler, and stock clerk.  *Id.*  On October 14, 2000, he injured his head at work, and has not worked since.  *Id.*

///

---

[1]  A medical report indicated Edmond had completed 2.5 years of community college.  A.R. 169.  Edmond's own report indicated completion of only one year of college.  A.R. 59.

3

1    The only mental limitation the ALJ imposed was that Edmond was capable

2    of performing only simple, repetitive tasks.  A.R. 17, 19.  The ALJ cited to the

3    report of Barbara Gayle, a State agency psychologist who examined Edmond on

4    March 5, 2002.  A.R. 17.  Dr. Gayle administered the following tests:  Wechsler

5    Adult Intelligence Scale, Wechsler Memory Scale III, Memory for Design, Trails

6    Making Test, and Bender-Gestalt.  A.R. 168.  Edmond reported to Dr. Gayle that

7    he had problems with concentration and memory.  A.R. 169.  In her mental status

8    exam, Dr. Gayle noted that Edmond was able to follow instructions, although his

9    response time was "slightly slow" and "[h]is effort appeared to vary."  A.R. 170.

10   Based on the Comprehension subtest of the WAIS-III, she found Edmond's ability

11   "to identify and solve problems falls in the impaired range."  *Id.* Edmond's verbal

12   IQ was 69, which is in the mild mentally retarded range; his performance IQ was

13   73, which is "borderline"; and his full scale IQ was 68, also in the mild mentally

14   retarded range.  A.R. 171.  However, she noted that the IQ scores were "a

15   minimal estimate of the claimant's current cognitive functioning, as they are

16   inconsistent with expressive and receptive language skills.  However, the

17   claimant may have lost some points due to time constraints."  *Id.*  Dr. Gayle also

18   found Edmond's mood to be "despondent."  A.R. 170.  She diagnosed him with

19   depression.  A.R. 172.

20       Dr. Gayle found Edmond's "immediate memory" to be sufficient to "focus

21   on questions and follow simple instructions."  A.R. 171.  Similarly, she found his

22   concentration sufficient to be able to "focus on questions and follow simple

23   instructions."  *Id.*  Dr. Gayle concluded that Edmond "has adequate cognitive

24   ability to understand, remember and implement simple to mildly complex tasks."

25   A.R. 172.

26       Edmond challenges the mental RFC adopted by the ALJ.  More

27   specifically, Edmond argues that the ALJ failed to comply with the legal standard

28   in rejecting the opinion of treating psychiatrist Perry Maloff, which would have

4

1   resulted in significantly more restrictive mental limitations.  JS 3-4.  An opinion of

2   a treating physician is given more weight than the opinion of non-treating

3   physicians.  *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007).  When a treating

4   physician's opinion is contradicted by another doctor, "the ALJ may not reject th[e

5   treating physician's] opinion without providing specific and legitimate reasons

6   supported by substantial evidence in the record.  This can be done by setting out

7   a detailed and thorough summary of the facts and conflicting clinical evidence,

8   stating his interpretation thereof, and making findings." *Id.* at 632 (citations and

9   internal quotation marks omitted).

10      Dr. Maloff, a psychiatrist, treated Edmond first on February 26, 2003, in

11  connection with his workplace injury.  A.R. 214.   Based on a mental status exam,

12  Dr. Maloff found that Edmond's calculations and remote memory were poor.  A.R.

13  215.  He diagnosed him with "personality change secondary to general medical

14  condition (closed head trauma)."  A.R. 216.  Dr. Maloff said that Edmond should

15  begin individual psychotherapy with Dr. Karman, prescribed Effexor, and should

16  remain under the care of Dr. Schweller.  *Id.*  Edmond had individual

17  psychotherapy with Dr. Karman, a psychologist, on March 7, 20, and 31, 2003.

18  A.R. 220.

19      Dr. Maloff saw Edmond again on April 2, 2003.  A.R. 218.  He said

20  Edmond's condition had "not improved significantly."  *Id.*  He noted that Edmond's

21  speech was "hesitant" and his memory "poor."  Edmond had further individual

22  psychotherapy with Dr. Karman on April 17, April 28, May 5, and May 16, 2003.

23  A.R. 221, 224.  Dr. Maloff saw Edmond again on July 16, 2003.  A.R. 225.  He

24  again indicated that Edmond's condition had not improved significantly.  *Id.*  He

25  noted that his demeanor was "childlike" and there were long periods of time

26  between questions and answers.  *Id.*  Dr. Maloff saw Edmond again on August

27  15, 2003.  A.R. 271.  He again indicated that Edmond's condition had not

28  improved significantly.  *Id.*  He noted that his affect was childish.  *Id.*

1    Dr. Maloff examined Edmond again on September 22 and November 15,

2   2003, and wrote a comprehensive psychiatric evaluation.  A.R. 278.  Dr. Maloff

3   found Edmond's psychiatric condition to be permanent and stationary.[2]  Part of

4   the input to Dr. Maloff's report was Dr. Karman's psychological testing.[3]  A.R.

5   281.   Although Dr. Maloff reviewed the test results, "[t]he opinion and

6   conclusions" were Dr. Maloff's.  A.R. 281.  In addition to the results obtained by

7   Dr. Karman, Dr. Maloff reviewed other medical records and reports, including

8   those of Dr. Liegler[4] and Dr. Feldman.[5]   A.R. 287-294.

9    Based on a mental status exam, Dr. Maloff found Edmond had long pauses

10   between questions and answers, most of his responses were only one or two

11   words, he had trouble identifying the hands of a watch, he heard voices, his mood

12   was depressed, his affect flat and regressed, and his capacity for insight and

13   good judgment was poor.  A.R. 296-97.  Although Dr. Maloff concluded that

14   Edmond exaggerated his complaints on the MMPI-2, he did so as a "cry for help,"

15   and the test results were nonetheless valid.  A.R. 300.  Dr. Maloff found that

16   Edmund was not a malingerer.  *Id.*  He found Edmund had demonstrated

17

18      [2]  In the workers' compensation context, "'[p]ermanent and stationary
status' is the point when the employee has reached maximal medical
19   improvement, meaning his or her condition is well stabilized, and unlikely to
change substantially in the next year with or without medical treatment."  *Zenith*
20   *Ins. Co. v. Workers' Comp. Appeals Bd.*, 159 Cal. App. 4th 483, 488 n.3, 71 Cal.
Rptr. 3d 724 (2008) (citation omitted).  "Permanent and stationary status refers to
21   medical rehabilitation from an injury, not ability to work."  *Id.* (citations and internal
quotation marks omitted).
22
      [3]  On September 22, 2003, Dr. Karman had administered the following
23   tests:  MMPI-2, Beck Depression Inventory II, Symptom Checklist 90, Wahler
Physical Symptoms Inventory, Quality of Life Inventory, Stroop Word and Color,
24   Trails Making Test A & B, and Hooper Visual Organization Test.  A.R. 257-258.

25      [4]  Dr. Donald Liegler examined Edmond on April 3, 2003.  A.R. 241.  He
concluded that Edmond had "no primary neurologic and no clinical neuro-otologic
26   factors of disability and none could be expected unless his head injury had been
considerably more severe than it was."  A.R. 254.
27
      [5]  Dr. Maloff indicates that Dr. Feldman performed a comprehensive
28   psychiatric examination on Edmond on June 13, 2003.  A.R. 289.

"significant mood lability, aggressive behavior, and significant apathy."  A.R. 303.
He found that Edmond's condition had deteriorated since 2002.  *Id.*

Dr. Maloff completed a "work function" chart rating Edmund's limitations in
the workplace in eight categories:  (1) "comprehend and follow instructions"
(moderate); (2) "perform simple and repetitive tasks" (moderate);[6] (3) "maintain
work pace" (moderate); (4) "perform complex and varied tasks" (moderate);[7] (5)
"relate to other people" (moderate); (6) "influence people" (moderate);[8] (7)
"generalizations, evaluations or decisions" (moderate to severe); and (8) "accept
and carry out responsibility" (moderate to severe).[9]  A.R. 307.  The eight
categories used by Dr. Maloff correspond to work functions in the Table for
Rating Psychiatric Disabilities ("Table") found in the 1997 version of the Schedule
for Rating Permanent Disabilities ("Schedule") (available at
http://www.dir.ca.gov/dwc/PDR1997.pdf).[10]  Schedule at 2-3.

///

[6]  Dr. Maloff rated the first two work functions as moderate because of "a combination of depression and cognitive difficulties which impair his ability to think, concentrate, and remember."  A.R. 303.

[7]  Dr. Maloff rated Work Functions #3 and #4 as moderate because of "significant apathy, loss of initiative, regressed behavior, and dependence upon his mother.   This is the result of a combination of both depressive symptoms and apathy associated with closed head trauma.  He is very much child-like in his demeanor.  He is not left alone."  A.R. 303.

[8]  Dr. Maloff rated Work Functions #5 and #6 as moderate because of "little initiative.  Most of the time, he appears removed, distant, and child-like.  At other times, apparently impulsive, aggressive, and labile.  He would have significant difficult (sic) communicating and interacting with co-workers or persons in positions of authority.  He has lost the ability to be independent in most activities of daily adult living with the exception of showering and dressing."  A.R. 303-304.

[9]  Dr. Maloff rated Work Functions #7 and #8 as moderate to severe because of "significant apathy, loss of initiative and confidence due to a combination of cognitive and depressive symptoms.  He would have considerable difficulty demonstrating confidence in his ability to think and act independently."  A.R. 304.

[10]  Cal. Labor Code § 4660 "governs how the percentage of permanent disability is determined."  *Zenith*, 159 Cal. App. 4th at 491 (footnote omitted).  The schedule in effect before January 1, 2005, was the 1997 schedule.  *Id.* at 492.

The Table lists eight work functions, assigns a Work Function Impairment Value ("WFIV") based on a scale from minimal to severe, and places each work function in Group I (Work Functions 1-3) or Group II (Work Functions 4-8). Schedule at 2-3.  Each work function, by itself, has the following WFIV (value in parentheses):  (1) "comprehend and follow instructions" (30%); (2) "perform simple and repetitive tasks" (30%); (3) "maintain work pace" (30%); (4) "perform complex and varied tasks" (12%); (5) "relate to other people" (29%); (6) "influence people" (6%); (7) "generalizations, evaluations or decisions" (16%); and (8) "accept and carry out responsibility" (8%).  *Id.*

The Schedule also prescribes a method for calculating the overall WFIV, which, in this instance, is the method expressed in Rating Calculation IV ("impairments within both Groups I and II") because Edmond was rated as impaired in all work functions.  *Id.*  Calculating IV(a) provides a Group I Amount of 60% (30 + (.5 * (30+30))).  *Id.*  Calculating IV(b) provides a Group II Amount of 37.4% (29 + (.2 * (12+6+16+8))).  *Id.*  To combine the results of the two groups under IV(c), the correct formula [60 + ((.45 - (60/300) * 37.4))] yields an unrounded result of 69.35%.  *Id.*  Rounding that to the nearest whole rating yields an overall rating of 70%.  *See id.* note 3.

The ALJ's sole comment about Dr. Maloff's reports was that he gave "little evidentiary weight to the analysis of lien-bearing psychiatrist, Perry Malouf (sic), M.D."  A.R. 18.  According to the ALJ, Dr. Maloff's "payment is a lien, dependent upon the favorable outcome of the claimant's worker's (sic) compensation litigation."  A.R. 17-18.

The ALJ erred in rejecting Dr. Maloff's findings solely on the basis that Dr. Maloff submitted a lien for payment.  A.R. 18.  Edmond challenges this reason for rejecting a treating physician's report as "inappropriate," and the Commissioner does not argue to the contrary.  JS 4, 7-10; *see Lester v. Chater*, 81 F.3d 821, 832 (9th Cir. 1995) (the ALJ erred in rejecting a physician's reports because they

8

1   were "clearly obtained by the claimant's attorney for the purposes of litigation"

2   and stating that "[t]he purpose for which medical reports are obtained does not

3   provide a legitimate basis for rejecting them") (internal quotation marks omitted).

4          The Commissioner argues that this Court may nevertheless affirm because

5   there is substantial evidence in the record to support rejection of Dr. Maloff's

6   opinion.  However, a district court is constrained to review the reasons that the

7   ALJ asserts for his or her decision.  *Connett v. Barnhart*, 340 F.3d 871, 874 (9th

8   Cir. 2003).  A district court may not affirm the decision based on reasons or

9   grounds that the Commissioner did not invoke in making its decision.  *Stout v.*

10  *Commissioner*, 454 F.3d 1050, 1054 (9th Cir. 2006).

11         Accordingly, because the ALJ did not articulate specific, legitimate reasons

12  supported by substantial evidence for rejecting Dr. Maloff's reports (See *Orn*, 495

13  F.3d at 634), the matter must be remanded for him to evaluate Dr. Maloff's

14  findings and determine what weight to give them.

15         Edmond also argues that the ALJ erred in rejecting Dr. Feldman's treating

16  opinion.  JS 5-6.  However, Edmond does not establish inconsistency between

17  the ALJ's RFC and Dr. Feldman's opinion.  *See* A.R. 293-294.  As the ALJ stated,

18  Dr. Feldman noted that Edmond's "MMPI-2 profile was invalid as a result of the

19  patient either having difficulty understanding the questions, answering questions

20  randomly, or attempting to fake bad."  A.R. 16, 293.  Dr. Feldman detected

21  "exaggeration of certain problems."  A.R. 16, 293.  "He could be malingering or

22  this could also be evidence of a cry for help."  A.R. 293.

23         **2.    Mental Limitation Finding and Hypothetical to VE**

24         Edmond also challenges the ALJ's finding that Edmond can perform his

25  past relevant work.  JS 6.  Based on the ALJ's mental limitation that Edmond

26  could only perform simple, repetitive tasks, the ALJ found that Edmond could

27  perform his past work as a bagger, delivery driver, baggage handler, and stock

28  clerk.  A.R. 19.  Edmond claims that the jobs of delivery driver, baggage handler,

1   and stock clerk require greater mental ability than reflected in the ALJ's finding.

2   JS 6.

3          The ALJ may rely on testimony a vocational expert gives in response to a

4   hypothetical that contains "all of the limitations that the ALJ found credible and

5   supported by substantial evidence in the record." *Bayliss v. Barnhart*, 427 F.3d

6   1211, 1217-18 (9th Cir. 2005).  The ALJ is not required to include limitations that

7   are not in his findings.  *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001);

8   *Osenbrock v. Apfel*, 240 F.3d 1157, 1165 (9th Cir. 2001).

9          Here, the ALJ found that Edmond "is capable of performing simple,

10  repetitive tasks."  A.R. 19.  However, the ALJ's hypothetical to the VE asked her

11  to assume that the claimant "would be limited in that he would be able to

12  understand simple to mildly complex instructions."  A.R. 351.  Although the

13  phrase "simple to mildly complex" may have been derived from Dr. Gayle's

14  opinion (A.R. 172), the ALJ must in the first instance clarify his RFC assessment,

15  including whether his RFC assessment means that Edmond is capable of

16  performing past relevant work that involves General Educational Development

17  Level 1, Level 2 and/or Level 3, and, if appropriate, take testimony from the VE

18  based on a hypothetical that is consistent with the RFC assessment.

19          **D.    Credibility of Edmond**

20         Edmond also challenges the ALJ's finding that his subjective complaints

21  were not "totally credible."  JS 15; A.R. 19.  In light of the remand based on Part

22  C.1 (Dr. Maloff), the Court need not reach this issue.  *See* Social Security

23  Ruling[11] 96-7p (available at 1996 WL 374186, *4) ("When evaluating the

24  credibility of an individual's statements, the adjudicator must consider the entire

25

26         [11]   Social Security rulings do not have the force of law.  Nevertheless, they
    "constitute Social Security Administration interpretations of the statute it
27  administers and of its own regulations," and are given deference "unless they are
    plainly erroneous or inconsistent with the Act or regulations."  *Han v. Bowen*, 882
28  F.2d 1453, 1457 (9th Cir. 1989) (citation and footnotes omitted).

1  case record and give specific reasons for the weight given to the individual's

2  statements.").

3                                    **IV.**

4                                  **<u>ORDER</u>**

5          IT IS HEREBY ORDERED that the matter is remanded for further

6  proceedings consistent with this Opinion.

7          IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this

8  Order and the Judgment herein on all parties or their counsel.

9

10  DATED:  April 22, 2008

11                          ALICIA G. ROSENBERG
                            United States Magistrate Judge